We have one more case on this morning's docket. And that is the case of Katherine Compton v. Stephen Compton. And we have Mr. Patrick Sharp for the appellant and Ms. Katie Ryman for the appellee. And we may begin with Katherine, your appellant yourself. Thank you, Your Honor. May it please the Court, my name is Patrick Sharp. I'm here on behalf of the respondent appellant, Mr. Stephen Compton. The only issue presented to the Court today is whether the Honorable Judge Dahlin of Jackson County erred in allowing the petition for removal regarding a party's minor child from the state of Illinois. We would ask the Court today to reverse the ruling, allowing removal. Some brief facts regarding the case. The parties were married on May 2, 2003. Their only child, Benjamin Michael Compton, was then born on May 26, 2005. The parties were subsequently then divorced on January 2, 2007. This post-judgment case was initiated by the petitioner, Katherine Mary Compton, by filing her petition for leave to remove the minor child from the state of Illinois on December 6, 2010. A hearing was then conducted on August 5, 2011. And then on August 29, 2011, the Circuit Court of Jackson County granted the petitioner's petition for leave to remove the minor child from the state of Illinois. And it is that August 29, 2011 order that we are now discussing today. As the briefs, or our briefs stated, the Illinois Supreme Court in the Ecker case laid down several factors that the trial court is to consider when a petition for removal is placed before the Court. The first factor is the likelihood for enhancing the general quality of life for both the custodial parent and the child. In the case at hand, the petitioner mentioned two specific changes to enhance the minor child's life. These were a financial benefit as well as a benefit to the minor child in that he would not be closer to her family. Throughout the case, three other potential benefits arose as well. This was the schooling in New York, the potential housing situation in New York, as well as the potential daycare situation in New York. And I'll address each individually. Regarding the potential financial benefit, the petitioner had been working at a women's center in Illinois and had testified that she was burnt out at work. As a result, she was looking for new employment. She began her search in Illinois. I believe the record will show she had 20 applications, I believe, that went out. She had a few job interviews, but nothing had stuck. As a result, she applied to jobs in New York. As a result of these applications, she received a single job interview, and that was all that she received from New York. I believe it's important to point out that this was only a job interview. She did not actually receive employment in New York. So as a result, she was asking the trial court to allow her to leave her stable employment in Illinois and go to New York, where she did not actually have any source of employment. Along with that, the job she had applied for, and it was her second interview in New York, was for an insurance job in New York. Interestingly enough, as part of her numerous applications in Illinois, she applied to just one insurance company in Illinois. Her second contention for potential benefit to the minor child was regarding that her parents would then be closer in Illinois. As she testified, she had no family here in Illinois. She was dependent on a respondent's family. His parents were here as well as his extended family. In New York, the petitioner's family would be two hours away. She did have a sister that was a little bit closer, but I believe the record show was still about an hour and a half away, or at least over an hour. That was as opposed to the minor child's family here in Illinois, which was all within the same area. If you're familiar with the Carbondale, Marion, and Cartfield-Hannon area, I believe they were all within that area. Her benefit for the child was simply not having a relationship with the family the child had known for his entire life. He had been present in Illinois for his entire life. How long was that? I forgot. I believe the minor child was... At the time of the trial. The time of the trial. Well, he was born in 2005, so six. So throughout his entire life, he had known his family as well as being with the respondent's family on most weekends for family dinners. Respondent was exercising three out of every four weekends per month as well as every Wednesday, and he testified that the majority of the weekends he did have the minor child. He was present with his family for family dinners. And our contention is there is no real benefit to the child in losing his Illinois family that he had known for his entire life and replacing it with a family in New York that he had only seen sporadically throughout his life, and I believe it was this court in In re Johnson that held that helping a relationship for one while damaging the other isn't necessarily a benefit to the minor child. I would contend that most are looking at a neutral change, and that's not a benefit. Throughout the trial, beyond just the financial and family benefits Petitioner had mentioned, the school situation also came about. At trial, several of the state reports were put forth for both the school in New York and the school in Illinois, and by Petitioner's own testimony, the schools in question were comparable. Again, as this court stated in the in-rate marriage for sale case, no evidence that one school is better is therefore not a benefit. If we're looking at comparable schools, we can't hang our hat on that as a benefit. On top of that as well, Petitioner testified that she had not visited the school as well. All of her information was secondhand off of a friend who had gone and done some investigation for her regarding the school. One of the other- They had the report cards or whatever they call them about. Yeah, the state reporting, but she had not actually physically gone to the school, and I believe the friend who had done some of the investigation for her was not actually a parent of the school in New York. I believe it just was some parents of the small school. Housing was also a situation that came up as a potential benefit for the minor child. Here in Illinois, both parties testified to adequate housing here in Illinois. Petitioner was in an apartment, but the respondent did have a three- to four-bedroom home that the minor child was with, or when he was with the respondent that he was residing in. Petitioner did testify, again, that there were some apartments in New York, but that was it. She had not herself visited any. She had not gone through the motions to set up a lease, nor are we contending that she should have had housing in place before the move, but it wouldn't have been very much effort on her part to be able to put forth to the court, here are three apartments or houses that I've actually gone, physically looked at, talked with the landlord. I can compare them then with the housing situation we have in Illinois. Where would the father stay during the summer? The child would be staying with him two months during the summer? The order had, I believe it was the first week after school was out and then the week before school was back in, so yes, he would then be residing. He would get at least two months for the summer. That's correct, Your Honor. The order gave father Thanksgiving break, which was November 23rd to November 27th in the upcoming year, Christmas break, a midwinter recess, a spring recess, and then the summer break. That gave Mr. Compton a total of, I believe, seven of the 12 months in which he would see the minor child. This is in, I would contend, much different than what the minor child had been used to previously. The minor child was used to seeing a respondent three out of four weekends every month as well as every Wednesday. Now we have where I believe the minor child will go from the end of August, depending on when school is going to start, until Thanksgiving without seeing his father. As several cases have stated, when you're looking at visitation time, you don't want to look solely at the quantity of time but also at the quality of the time the father is going to have. As this case is allowing, there will be onerous travel required with this small boy in order to make it from New York to Illinois and vice versa. As testimony showed, the minor child is going to have to have a drive from southern Illinois to Springfield, excuse me, St. Louis, an hour and a half, two hours, as well as a non-direct flight from St. Louis to New York. I believe both parties testified that that would be at least a day of travel. When you're looking at father's time, immediately two days come off as that's just travel time for the minor child. For the quick turnarounds, yes, he has November 23rd through the 27th of parenting time with his son, but two days of that is going to be eaten up by just travel alone. Was there any provision for how the child would travel on the airline? I did not spell out specifically in the order. Miss Compton was paying for the child's travel, but I don't believe anything was specifically put into the order as to if someone was to accompany the child or if father was to go with him to New York. None of that was actually included. With the housing, as I mentioned, she had not seen the housing and we could see no true benefit from the housing. The town that she proposed to live in was where the hope for employment was? That's correct. The town she petitioned to move to was the housing that she had not seen but had investigated. The school she had not seen but investigated and her work as well. Along with what she investigated in the town, she again looked into daycare for the minor child while he would be in New York. Again, she had not seen the daycare, but she had had her friend again investigate on her behalf. Again, it's our contention that that cannot be seen as a benefit for the minor child. As petitioner testified, she did utilize respondent's family to watch the minor child. At this point, we're swapping family for strangers. As far as the first eckard factor goes, there really is no direct or indirect benefit for the minor child with what was brought up at court. In fact, if we're only looking at the moving parent's happiness in being closer to her family, then we'd be looking at all removal cases as simply ceremonial. Of course, the moving parent's going to be happy with where they're going. At this point, there's one that's petitioning for the move. The second eckard factor was regarding the motives of the custodial parent in seeking removal. As we went through, she did have a financial motivation for removal, but that does come into question somewhat as she was looking for an insurance position in New York but applied to only one insurance position here in Illinois. It would be our contention that if she was so interested in obtaining insurance employment, that it might not have been a bad idea to apply to more than one insurance job in Illinois. As well as her other motivation being to be closer to her family, as this court held in, I'm going to butcher the name, I apologize, in Kribbe, that simply wanting to be by one's family is not enough of a reason to necessitate a removal action. So while she does have some understandable motivation for her removal, it would be our contention that it's not rising to the level to take a small boy away from his father and his father's family who he's known for his entire life. The third eckard factor deals with the motives of the non-custodial parent in resisting removal. We're in full agreement with the trial court on that point. There was no evidence to show that Respondent's motivation was anything but trying to continue the strong relationship he had with his child throughout the child's life. The fourth and, quite honestly, probably the most important eckard factor is the ability to maintain a close relationship with both parents and family members. When we're looking at this factor, we need to first look at the Illinois Marriage and Dissolution of Marriage Act, which one of the purposes of that act is to ensure involvement of both parents. I believe if you look at this removal action, it's hard to say that that was accomplished in this action. Specifically, when we look at the Illinois Supreme Court's statement in the eckard matter that the court should be loath to interfere with a parent's relationship when they diligently exercise their visitation. All evidence at trial illustrated Mr. Compton as having diligently exercised his visitation throughout the minor child's life. He went above and beyond the court-ordered time. He was taking time, and in fact, Ms. Compton was generous enough to allow him more time, but he was going above his time. He was not missing visitation. Along with that, he was involved at the minor child's school. He was going to parent-teacher conferences. He was attending extracurricular activities, going on field trips, as well as not having any issues with having paid his child support. Along with that, his family was heavily involved with the minor child. They saw the minor child on most weekends. As Petitioner testified, she did utilize them at times for babysitting purposes of the minor child. Not only was he having just extended family present in Illinois, he also had children his own age. So it wasn't a family gathering, maybe a grandma's house where he had no one else to interact with. There were children his age present in Illinois. There were relatives. Correct. I'm sorry. Did I say parents? I hope not. No, you just said there were children. Oh, okay. I apologize. And we also have a real lack of involvement on the part of respondent's parents. As testimony showed, they rarely were able to make it to Illinois, and part of that was due to how difficult it is to get from New York to southern Illinois. And what's the travel from the town in New York to an airport? I believe respondent testified that that was not a long drive. This is Buffalo? Correct, Your Honor. It's like a suburb of Buffalo? Yes. It was definitely not as long a drive from St. Louis to Carpendale. It wasn't a two-hour drive. Thank you. You'll have the opportunity for a rebuttal. Thank you. Ms. Raymond. Thank you. May it please the court, my name is Peggy Raymond, and I represent the petitioner, Catherine Kelly, in this case. This matter is before the court. I apologize, Your Honor. The reason I'm doing that is because it's being recorded. Maybe you can move that a little closer. It might help. That might help. Can you hear me better now, Your Honor? Well, I mean, it's being recorded. That isn't amplified. I'll try and speak up the best I can, but I am in the process of losing my voice. The trial court in this matter set forth in great detail the reasons in granting the petition for leave to remove. Each factor that's to be considered under ECHR was considered and discussed in that order. The factors are as follows. The proposed move in terms of the likelihood for enhancing the general quality of life for both the custodial parent and the minor child, the motives of the custodial parent in seeking the removal, the motives of the non-custodial parent in resisting the move, and whether a realistic and reasonable visitation schedule can be reached. There's also a presumption in favor of the trial court's decision. Kate was employed by the Women's Center in Carbondale for over ten years. Nine of those years, she was a rape counselor, rape crisis counselor, and she testified that over the years, she's been experiencing some burnout. There was more stress associated with her job. It was just becoming more and more difficult to listen to all of these horrible stories that were coming in, and she was needing to have a change because her mental health was being affected. She then changed to become a child counselor through the Women's Center. When she first began working at the Women's Center, she was earning approximately $25,000 to $26,000 per year. Most of the funding for the staff is through grants and through the state of Illinois, and unfortunately, with our state's financial condition, there are more and more concerns about whether or not they were going to have funding to pay their employees. At the time of the trial, her pay stuff was introduced into evidence, and at that point in time, she was on track to earn just a little over $27,000 for 2011. That's barely, at most, maybe a $2,000 difference from when she had started ten years ago. What was her educational background? She had a bachelor's in anthropology, and she had started her master's but had never finished that, and I believe she testified that if she wanted to go back and get her master's, she would basically be starting all over again. How did she pay for the transportation for the child? For the move to New York, Your Honor? Right. From there back here to Illinois. How did she pay for it? She has received employment in New York, and I believe her parents were also willing to assist her if necessary. But she, going into this, she was going to be planning a budget with the expectation that she would be responsible for the airfare for her and my own child to come from New York to Illinois and back. What was the amount of her income from New York, her wage in New York? Is that of record? The job offer, the interview that she had with Geico Insurance, the starting salary was going to be $29,000. She had more benefits that would be available through that job. There was also more room for advancement. There was no room for her to move up at the Women's Center in Illinois. Because of her education, she didn't have the necessary qualifications to move into a supervisor's file. I want to ask a question that's a little bit tangential, but I thought there was an argument by you in the brief that the cost of living was lower in Buffalo, New York, than in Carbondale, Illinois. That's correct. And who put that into evidence? That was one of the things in researching Snyder, New York, and Carbondale, Illinois, that Catherine located through her research, and that's what she testified to at trial. And in terms of rents for two-bedroom apartments, she could find a two-bedroom apartment in Snyder, New York, that was basically the same amount for what she was paying for a two-bedroom apartment in McAnda, Illinois. Now, as Mr. Sharp testified, she had not been to Snyder to physically look at the apartments. She had been online. She'd been talking with real estate agents. One of her best friends from when she was a teenager still resides in Buffalo. Her friend did a lot of the legwork. She also looked into the schools in New York, and her friend connected her with parents whose children actually attended Smallwood Drive Elementary School. And so she talked to those parents whose children were attending that school, got their feedback about the school, as well as what she could find online as well. And she ever visited the town of Snyder? She had been to Buffalo several years ago. I'm talking about the town that she proposed to move to. I believe she had. I cannot recall that off the top of my head. The week after the trial, she was going back to Snyder for her second interview with Geico, New York. And so that's physically where Geico was, and that's where she had had her interviews, you're saying? Her first interview was via the telephone, but the second interview that she was going to the week after the trial was actually in Snyder, New York. Geico, where she was at, it was about nine minutes from the school and the area she was looking at trying to find an apartment in. Now let me get this. She did not have a job with Geico, or she had offered a job with Geico, or just a second interview with no offer? She had a second interview with Geico at the time of the trial. And that's as far as it's going? Correct. And the first one was just a phone interview? That's correct. They did the phone interview, and then they asked her to come to Snyder for the second interview, and that was the week after the trial. She did look for jobs in this area. She had applied for over 30 jobs in the Southern Illinois area. She looked in retail. She looked in social services, banking, legal, insurance. She received three replies from those. One was as a legal secretary that was paid $9 an hour with no benefits. One was from Macy's as a beauty consultant, which the day before the interview they called her and canceled that. And another one was for a manufacturing company that would be based on a commission-only income. The Smallwood Drive School ranked very highly in the state of New York. The school report card showed that that school exceeded the majority of the state levels in most of the areas of the testing. There was suitable after-school care for the child, either at that school or also through the town of Snyder. They had their own after-school workshops, and there was openings in both of those for the child. Now the Mr. Sharp argued that there was no benefit to this child to have a better relationship with Kate's family because he wouldn't then have the relationship with Mr. Humpton's family. I don't agree with that, Your Honors. I think that this child should have a good relationship with both families. By moving to New York, he's going to be able to have a good relationship and get to know his mother's side of the family better. The visitation schedule that was provided in the trial court's order gives him ample opportunity to come back here and be with his father and with his father's family. The second factor is Castillo's parents in moving. She'd been here basically as a single parent on her own since the party's divorce was filed in 2007. She had no family support. She had friends, yes, but they weren't able to provide her with the support that she needed. She used Mr. Humpton's family as a backup. I don't think there's any improper motives in her wishing to move to New York. There was testimony from both parties that Mr. Humpton received visitation beyond what was in the court order. He wasn't awarded the Wednesday night visitation in the trial court's order, but yet that was something that the parties began doing, and even once this was on file, once Mr. Humpton began contesting this, it didn't pull that away. She let him continue to have those Wednesday night visits. She also continued to use his parents as some of the summer day care a couple of days during the week. There's no, in my mind, there's no improper motives. We also don't believe there's any improper motives on Mr. Humpton's part in resisting the move. The fourth factor is whether there's a reasonable and realistic visitation schedule. Mr. Humpton tried to argue that because of the flight, nothing could be reasonable. This child has been flying between Illinois and New York since he was a baby. Both parties testified that Kate has taken him to New York to visit her family for family functions. That's been happening. He's now six years old. Mr. Humpton also cited a privy in the fact that a realistic visitation schedule cannot be reached, but I think that case is very distinguishable. In that case, the mother was granted leave to remove to Minnesota from the Mount Vernon area. Dad, the parties met halfway. The parties still had to travel 850 miles round trip to do these changes. So when the dad had a long weekend during the school year, basically his visitation schedule was cut down to one, maybe two days if he was lucky. That is not the situation in this case. Kate testified that the air flights would take half a day to a day. Almost all but one of the visitation schedule that Mr. Humpton was receiving under the order is for a week or longer. So even allowing for the travel time, he still has several days to spend with his child. He was awarded the Thanksgiving break. He was awarded the majority of the Christmas break. There was a week in February for a mid-winter recess. There's a week in April for spring break. And he received all but two weeks of the summer visitation.  There are how many hours Mr. Humpton was receiving under the original divorce decree and the number of hours he would receive under her proposed visitation. And that was a comparable schedule. Now, the court has to look at and determine if the schedule can preserve and foster the child's relationship with the other parent. Now, I understand, Your Honors, that nothing can replace having a day-to-day contact with your child. But the fact of the matter is we are in a mobile society. Things change in people's lives and people do move. But I think that in this situation, given that the child breaks from school and how often the child can come back here for visits, I don't think that the quality of the relationship that the minor child has with his father and his extended family on his father's side will be impacted. I think there will still be ample opportunity for this child to be connected with his family. Granted, the longest amount of time that this child would go without seeing his father and his family would be from about the very end of August until Thanksgiving break. But otherwise, it's basically about every other month this child would be seeing his father, and then during the summer he would see him at least three months in a row. Eckert stated that this cannot be reduced to a simple bright-line test. This has got to be on a case-by-case basis. No one factor is controlling, and the court is to consider and balance all of the factors. And I believe in looking at all of these factors and considering all the evidence that the trial court was correct in granting the removal. There's nothing to show that Kate is not willing to foster and help preserve the minor child's relationship with her ex-husband and his baby. She's willing to provide all of the airfare transportation to and from New York to Illinois. She's willing to give up all of the major school breaks so that this child can be with his father. She's basically giving herself two weeks in the summer if she was to take some type of vacation or have some fun time with this child. Any extended long break, she's giving it to Steve so that he can have time with this child. And again, I believe that whenever you look at all of the factors, the trial court was correct in that this court should affirm the trial court's decision. Thank you. Thank you, Ms. Freeman. Do you have any rebuttal, Mr. Sharpe? Yes, ma'am. I just have four quick points, Your Honor. The first would be to remind the court that, yes, Ms. Compton, in fact, did not have a job in New York. She was leaving stable employment in Illinois for the hope of employment in New York. The second point being, again, as this court held in intermarriage with Johnson, swapping families isn't a benefit. The third factor, again, I did not have time to address the fifth factor, but when we're looking at whether a reasonable and realistic visitation schedule can be reached, one of the important points to remember is we have to look for a realistic visitation schedule as well. Is it realistic that in the future a young guy or young man, excuse me, is going to want to leave the place he lives the majority of the time, every Thanksgiving, every Christmas, every summer? I believe that's a valid question. As well, yes, the minor child had been going back and forth between New York and Illinois, but I believe testimony showed that it wasn't exactly a great trip for the little boy. He was tired. He was cranky. As I imagine, just about anyone would be after a direct or non-direct flight from New York to Illinois. As well, finally, I believe Ms. Raymond did put it perfectly, that nothing can replace the day-to-day contact a minor child has with his father. And what we would request is that simply more be required in order to lose that contact. Here we have really no substantial benefit to the minor child that necessitates this move. We have no better employment. We have no better housing. We have no better daycare. What we have is simply the swapping of one parent's family for the other parent, and it would be our contention that that's just not a substantial enough benefit to allow removal. So for the foregoing reasons, we would respectfully request that this court, by the trial court's ruling, was against the manifest way of the evidence, and would reverse the order granting removal. Thank you. Thank you, Mr. Sharpe. Thank you, Ms. Raymond. And we will take the manner and advice of rendering ruling and divorce. And we stand in recess until 1 p.m. All rise.